The next case call for hearing is 5-15-0165, Peoples National Bank v. Rick Lane. Mr. Crosby, good morning. It's nice to see you. I represent the attorney Rick Lane in his action against Peoples National Bank and in defense of Mr. Lane and Peoples National Bank action against Mr. Lane. I know that you're familiar with the facts of this case, and I won't belabor them, but I will mention that there's a motion to strike abortions of the bank's brief, which are argumentative of the merits of the case, because in the case where judgment was entered against Rick Lane by the bank, that was done on a 2-6-15 motion for judgment on the pleadings, and in the case where judgment was entered against Mr. Lane and in favor of the bank, that was done on a 2-6-19 motion. And therefore, the facts are frozen in the pleas. This is a case where the bank is seeking to broaden the scope of the Credit Agreement Act into a form of a gag order that prevents civil actions between the bank and, in this case, its agent, Rick Lane. Is there any question that Mr. Lane was the agent of the bank? No, there's not. And we are, as I said, and as the Court knows, Judge Cates, the pleadings are what controls that. There has been no answer filed by the bank nor any counter affidavits filed by the bank in relationship to Lane's 2-6-19 motion in collection action, which establishes clearly that he was the authorized representative of the bank at the time that he signed the notice. And I think that's what's also telling. And the collection action that you're referring to is Lane's collection action. No, I'm sorry for the confusion. I'm going to call him PNB, People's National Bank, sues Rick Lane on the notes that People's National Bank, as the principal, directed Lane to sign. That's 12-40. That was 40, and Lane v. PNB is 41 consolidated. So I'm just wondering, when you use the word collection, which one you were referring to. I'm going to speak in terms of collection with regard to the bank's action and recruitment in terms of Lane's action against his principal to recoup the $77,000 of his own money that he spent in the discharge of his duties as the agent. What is really the issue here is whether People's can expand the scope of the Credit Agreement Act in an attempt to conceal the legal relationship between the parties, a legal relationship that predated the notes that the bank seeks to collect from Lane. It is the legal status of Lane in relationship to the bank that determines the liability on those notes. It is not an oral credit agreement, and it is not anything related to an oral credit agreement. And I think that in analyzing this case, what Judge Clark failed to do was to look at the language of Section 2 of the Act closely. The bank was saying any defense or any recoupment action or any declaratory judgment action cannot be brought because they all relate to the signed promissory notes. And anything, any agreement that relates to a signed promissory note is barred by the Credit Agreement Act. But the Credit Agreement Act doesn't say that. And just if we look at Section 2 of the Credit Agreement Act, just the first sentence, a debtor may not maintain an action on or in any way related to a credit agreement unless the credit agreement is in writing. So what this is saying is there's two clauses here. You can't maintain an action on a credit agreement unless that credit agreement is in writing. So it comes down to is there an attempt by Lane to force an oral credit agreement in the collection action that somehow changes the terms of the notes, the security agreements, or anything else? Answer, no. Answer, no. In the collection action, perhaps it's best if I deal with the recoupment action and the D.J. action first. Rick Lane brings an action against the bank because part of his duties of selling this equipment for the bank, his collateral from a bad death the bank had taken, and then transferred to Lane for purposes of him to sell that equipment. All of the money, every penny of the money from the sale of that equipment went to the bank. The bank— That's a question I have for you. Did any of the—I saw that in the brief some of the property was sold. Was any of that money used to reduce the obligation on a promissory note? You said the bank got all the money. The bank got all the money, and the bank applied that to the promissory note. Okay. But initially I think it's important to look at—and it really sort of clarifies what the bank was doing here. When the bank wrote the promissory notes and the $2 million promissory note, the $250,000 line of credit, it didn't extend to Mr. Lane proceeds from that. In other words, he was not given a cashier's check to go out and buy anything. They simply took the amount of the loan and reduced S. Cole's obligations to them as if they were doing this under article 9. But at the same time, even though they reduced the obligation of S. Cole, the note stayed in full until— That was my question. Yeah. Until he sold equipment. Okay. And then they start reducing the indebtedness on the note. When Rick Lane signed this note, he didn't care what the value was on that note. He was doing what the bank instructed him to do. Neither the bank—this is the facts that are plain. I'm going to take it as true. Neither the bank nor Mr. Lane had any idea what the value of the notes were. That's why the bank chose— The value of the property. Property. I said the notes, yeah. The value of the collateral that it had repossessed. That's why the bank asserted that the value was the outstanding debt from S. Cole. Now, Lane took possession of the equipment. Lane—that's an interesting question. The equipment really wasn't moved. It was out on the surface of a mine in Sleet County, a strip mine. And a lot of it was in bad repair. Some engines were out. But the other thing is it's not road-ready equipment. We're talking about 777D Caterpillars that are larger than this room. Moved for stripping over group. They stayed at that location. They stayed at that location until they were sold.  The owner of the property, when S. Cole goes down, is not going to tolerate the bank parking his equipment there. So in order for Lane to have access to that equipment, to get it maintained or to move it when it was sold, he had to pay $25,000 to the surface owner. Now, that is not— Is that part of that $77,000? No. Because—and this really shows that it's a principal agent. The bank then reimburses Lane for that expense. Why? Why? Because they are a principal. They are benefiting extremely from the deliver sale of this collateral rather than an auction. So Lane brings a DJ action. Why is a DJ action somehow falling within the ambit of the credit agreement? Certainly a DJ action isn't based on an oral credit agreement. Nothing in this case is. So why does it disappear? In analyzing this case, you have to look—I think I would respectfully suggest that you have to look at two questions. Where is the oral credit agreement? Where is the oral credit agreement? Lane isn't propounding any oral credit agreement. And what did the trial court do when it struck Lane's recruitment action? Why was Lane's recruitment action struck? Because the court said that action relates to a signed credit agreement. But as we've just found out, that Section 2 doesn't talk about bringing an action or a defense based on a signed credit agreement, only on an oral credit agreement. So where is the oral credit agreement and what is Lane's recruitment action related to that would bring out the FAR of the Credit Agreement Act? In their brief, the bank says, look at Article 3. Article 3. Actions not considered agreements. The following actions not give rise to a claim, counterclaim, or defense by a debtor that a new credit agreement is created unless the agreement satisfies the requirements of Section 2, the writing requirements. And they look at Paragraph 3. They talk about Paragraph 3. The agreement by a creditor to modify or amend an existing credit agreement. Well, the agreement that took place between Lane and the bank happened on March 19th when Lane agreed to be their agent. There was no existing credit agreement that could be modified. To otherwise take certain actions, such as entering into a new credit agreement. There's no allegations that there was a new credit agreement. Forbearing from exercising the revenues in connection with an existing credit agreement. Once again, there was no existing credit agreement. And nor does Lane say that, and the last one is, rescheduling or extending installments due under an existing credit agreement. Once again, no existing credit agreement. The bank says, well, what difference does it make that the agency agreement was, relationship was formed before the notes were executed? Well, what difference it makes is whether it falls within the scope of the credit agreements act. Lane's declaratory judgment action sort of dovetails in with his defense to people's collection action. How so? When we get to the UCC. The issue in the UCC, in this case 402B2, talks about in a negotiable instrument, who's liable on a negotiable instrument? Ordinarily, the signatory. Now, in the comments to the UCC, it sets out situations where there's an ambiguous signature. Whether a corporation is named in addition with the signatory and no relationship is shown between them. And it also talks about where just a representative signs with no indication on the note that there is a representative party. And in that case, which is the case we have here, the comments and the UCC provide that the representative is liable on the instrument unless he proves, quote, that the original parties did not intend the representative to be liable on that instrument. So how is Lane going to prove that the original parties, the bank who's trying to collect it and himself, did not intend for Lane to be obligated on these notes that were written at the direction of the bank for purposes of transferring ownership to Lane so he could sell this property? How? Lane's going to prove that there is an agency relationship that started on March 19th and that looking at the UCC and the elements, who's the original parties to the note? People's National Bank and Lane. So we've met that prerequisite. Is there a holder in due course? No, the note was never factored. So Lane is presumptively liable on that note unless he can prove that he signed as a representative with the authority of the bank. That is what the D.J. action says. That it sets out to prove and have the court declare that there's a legal relationship between the bank and Lane. And once again, it's that legal relationship that determines liability. There's nothing in the agency agreement that changes one paragraph, one sentence, one letter of the notes for the security agreement. The only thing the agency relationship does is change the liability by the application of the UCC. For some reason, the bank says you can't look behind that curtain. For some reason, the bank, without any authority, says that as a maker of this note, Mr. Lane cannot prove he signed in a representative capacity. I've seen no authority for that. Their argument is that in order to get his foot in the door to prove that he was a representative signing with authority for the representative party of the bank, he must show us a paper where the agency relationship is established on a piece of paper. The Credit Agreement Act has nothing to do with agency relationships. And the law in Illinois is that agency relationships don't have to be established by rights. And we addressed that when we talked briefly about the statute of frauds defense that was raised. But what we really have here is a situation where the bank disabuses Mr. Lane. And after discovery, it became clear to me that the bank had intended to leave its agent, Lane, holding the bag if they couldn't recoup every dollar that the coal company owed them. And how do we know that? Well, we know that Lane, on repeated occasions, wrote to the bank and said, hey, the equipment's almost gone. We need an exit strategy. So what was the bank's first suggested exit strategy? Let's kick this down the road. They foreclosed on a farm. And they told Lane that this farm will, if you buy this farm for us at an incredible discount, it will cover not only the $600,000 that's left on the notice for the equipment, but you'll be able to sell it and make a profit. Well, it was a fish farm, and Mr. Lane didn't want that fish farm. So he said, no, I just want our $77,000. So there's multiple. So what is the reason the banks do this? Is there a regulatory process that they're trying to avoid on the books? Well, I've discussed, and to my discredit, this is a question that I've discussed with Mr. Lane. He didn't really know. He did know that the banks told him, the bank, Billy Bonham Jr. told him, March, the end of March, March 31st, we have a quarterly reporting due to the Office of Comptroller. And we'd like to get this bad loan ameliorated so we look better on paper. Right. There's, under the regulatory process, if you've got too much bad debt. Right. Then you have to set aside that amount in order to make sure that your institution is financially sound. Right. But I don't think that was the reason. I don't think that was the reason. The thing that made me think about that was the farm issue. Now they've got another bad debt, and now they're offering them another opportunity. Yeah, and I don't think that was exactly the same because it wasn't the size of the escrow debt, and it was a year later. It might be the same practice. They did eventually sell the farm through the bank. But I think what really happened here, and I mentioned it in my brief, is that the bank is competing with Caterpillar for the equipment that's out in the field. Caterpillar had told the bank, as to those seven pieces which they want to claim to sell. We're not going after them, but they have S-Coals going down. S-Coal was a bad credit risk in southern Illinois for years. They have a lot of credit risk. So what happens in a case of a secured creditor, they have to sell the collateral in a commercially reasonable manner. What the bank did here is instead of selling the collateral, they had the two principals of S-Coal get out of their personal guarantees by signing a bill of sale of all the collateral out on the mine site to the bank. So that the bank, ostensibly, is the owner of the equipment. But they still have their duties as a secured creditor. So what they have to do is to sell that equipment, and they have to sell it in a commercially reasonable manner, and they have to do it right away. What the bank's concern is, we want all the money from the proceeds of the sale of this, and we want to maximize the amount that we can get from the sale of this equipment. If you have an auction, you're going to get a final auction, you're going to get much less of a recoupment on your debt. This is my surmise. So I think that was the impetus for setting him up as an agent, but to the world, he looks like a bonafide purchaser. Okay. Mr. Cosby, you'll have some additional time. Thank you. And I did not make it clear that there is a third justice assigned. It is Justice Schwarm, and he's unavailable today. But as you both know, these arguments are recorded, and they're available electronically. So Justice Schwarm will be listening to your arguments as a part of this decision. Good morning. Good morning, Mr. Stone. May I please report? How are you? I'm fine, thank you. You may proceed when you're ready. Thank you. I'm troubled by a couple of things that were said by Mr. Cosby, and so I want to make sure that the Court understands how we've gotten here. 12040 is a case filed by the People's National Bank on notes and amendments to notes against Mr. Lane. 12041 is a claim that Mr. Lane brought seeking a declaration and then contractual remedies based on an agency relationship. There was a 2619 motion filed by Mr. Lane against 12040. There was a 2619 motion filed by the bank against 12L41. There was a 2615 judgment on the pleadings motion filed in support of 12L40. Mr. Cosby says there was no counter-affidavits to the 619 motion filed by Lane in the 12L40. And I regret to say I don't have the page number in the record, but my memory is that on September 12, 2013, in support of what was going to be a consolidated hearing on all motions, People's National Bank filed a supplement to its motion in the 12L41 case, a response to the 12L40 case, and that's how Mr. Lane's deposition got in the record. That's how all the documents that betrayed Mr. Lane's theories got in the record. And so there is evidence in counter to the affidavit that was said. I mean, I have his own testimony that was filed. So it's simply wrong to suggest that there was no counter, and it's simply wrong to suggest that the facts are frozen in the pleadings. As I understand, the late Justice Chapman's real treatise on motion practice is that when there's a 2619 motion, the facts that are pled are measured in light of the evidence that's put forward in the 619 motion. Not all facts are just frozen in time. You consider those facts in light of other facts. And there is example after example where Mr. Lane, through Mr. Crosby's what I call legal ingenuity, he's pled certain things, but then he testifies to quite different things. And so I think the court looks not only at the- Give me an example of that, Mr. Stone. Huh? Give me an example of that, where something was pled and he testified to the contrary. He says that he wasn't the owner. He testified, I was never the owner of that equipment. He pleads that he was the owner of the equipment at the behest of the bank. He testifies that he was never the owner of the equipment, but there's a bill of sale that says he was the owner of the equipment. He insured the equipment as owner. He filed a police report saying he was the owner when something was stolen. He filed a proof of loss saying he was the owner of the stolen equipment. He received insurance proceeds as owner. So there is a ping-ponging between what I think is an attempt to skirt the Credit Agreements Act and what the reality is. And I gave example after example in my brief. My whole statement of facts basically says that. It sets forth all the areas where he pleads one thing and says another or testifies to it. And I can understand why he wants those facts stricken from my brief because they betray the very things that he's pled. So the court asked, is there any dispute that he was an agent? Well, of course there's a dispute. Now, he pled that he was an agent. And we filed motions to dismiss based on 619, supported by his testimony and supported by documents, which evidence that he was just a purchaser of this equipment. And he sold it. Unfortunately, he didn't sell it for the amount of money that he bought it for. What about the agency allegation of March 19th that he was the one contacted by the bank? Well, that's his allegation. But again, read his testimony. And he says, Mr. Crosby, in his brief and in the circuit court, says these are separate deals. There's an agency relationship. Put that in a box and close it. And then there are notes. Put that in a box and close it. And they're not the same thing. They're not related. They're not in any way related. Because you have to avoid that construct of it being in any way related to the notes. Because once the agency is in any way related to the notes and the desire is to get out of the obligation of the notes, if they're in any way related, it triggers the Credit Agreements Act. So Mr. Crosby cleverly says these are separate things. One's in this box and one's in this box. I asked Mr. Lake in his testimony, what is the relationship between what went on in your meeting on the 19th and these notes? He says it's all the same deal. We talked about the notes on the 19th. So they're related. Under your argument, then, anybody, any bank can approach an individual and say, we're going to do a deal and you need to sign these documents. And then you want to preclude that individual from ever being able to introduce the agency agreement. It's a bar. It's an affirmative matter that bars the action. Isn't that what you're seeking? The Credit Agreements Act says and means, if it has any meaning at all, that if you enter into a commercial credit agreement with a bank and you then say that there's another aspect of it, a side deal, as Mr. Lane calls it. He calls it a side deal in his testimony. If there's a side deal, that side deal has to be in writing. It has to be signed by both parties or it is not enforceable. So you think that the Uniform Commercial Code cited by Mr. Cosby has no impact here? It should be ignored, basically. No, it has broad application. The Credit Agreements Act has narrow application. This is a more specific act. The Credit Agreements Act came after the UCC. And it impacts the UCC as it relates to this because it's more specific. And we have example after example of that in the law. So in the context, Mr. Cosby says, according to the UCC, Mr. Lane gets to say, by parole evidence, I signed this as a representative of the bank. He gets to say that. He has said it. It's not like the court ignored it. He wasn't barred from saying it. It wasn't admitted and not and then refused. It's just the application of the Credit Agreements Act says, well, that's nice. But in order for it to be enforceable, it must be reduced to writing and signed by both parties. And that's the law. And the Credit Agreement Act has been applied in that way for two decades. And, indeed, initially when the Credit Agreements Act was interpreted, the very arguments that Mr. Crosby is making, very similar arguments, like, well, we get to explain ourselves. There was a separate deal with the president of the bank. Or I didn't really have to. I mean, I'm terrible about case names and case facts. But there's that case that I cited in my brief where a car dealer is in debt to GMAC. GMAC finances the entire lot. And they're about to bounce the check to GMAC. And the local dealer calls the bank and says, can you cover me till Monday? And the bank says, sure, I'll cover you. I can. Bank guy says, I can come today with money. I can make sure there's enough money in the bank. Bank says, don't worry about it. They default on the check. And the car dealer sues. And this court by sister district says, that's really tough. Because the agreement you say existed where they were going to forbear on that check was an oral agreement. It was not reduced to writing. It was not signed by both parties. And it sucks for you, but that's the law. And, indeed, one of your sister districts said the application of this is very harsh. And we asked the legislature, do something about this. Because as we are interpreting it, as you've written it, unscrupulous banks or just people who are just unfair can get away with being unfair. And the legislation was not amended. Now they tried. And they signed it. You know, Senator Collerton gave a speech. But this court has said, you don't interpret an act differently because one legislator decides to make a speech about a particular law, and the law has not changed. You know, in the words of Pat Murphy, I'm about as free-of-cheese liberal as there is. I'm about as soft-hearted a guy as you know. And this is a harsh result. But I'm also an officer of the court, and I know what the law says, and I know how the law has been applied, and that's what I'm here to advocate. And until the legislature changes it, this is a very tough outcome, particularly because of what Mr. Lane thought. Mr. Lane thought he had a different deal altogether. But that deal is not reduced to run. What do you have to say as far as their motion to strike your portions of your brief? Well, I think there's two reasons why the facts as I've elicited should stay in my brief and my argument. One is I've already articulated it. It's a 2619 motion, and I filed documents in support of my 2619 motion and in opposition to their 2619 motion. As I said, I don't remember the page of the record, but my memory is I filed those on September 12, 2013. And it's the pleading that resulted in all of those things being in the record, and those were things considered by the court. And in a 2619 motion and a 2615 motion are different animals. This court has said so. Justice Welch was a member of the court when Judge Chapman wrote that treatise. I've got it in my desk drawer. I refer to it all the time. And if I understand what Justice Chapman was saying back then, you don't just freeze the facts on a 2619. You consider those facts in light of other facts. And here, when you compare what he testified to and what the documents evidence, they're contrary to that which he alleged. And everything that he alleges drives him into a corner that is occupied by the Credit Agreements Act. And due respect to Mr. Crosby, I think he's torturing the legislation. I mean, if Mr. Crosby is correct, then the Credit Agreements Act has no meaning because commercial borrowers can simply always say there was a different deal. I had a side deal with the president of the bank. I know the loan officer. Her daughter is in my daughter's ballet class, and he said don't worry about it. And that's not the law. And in fact, there's been cases where partial performance occurred based on side agreements, and then they weren't enforced. So that's how harsh it is. The second thing is, one of the things we're here to discuss is whether there should be an amendment allowed. And in response to that, I also filed all of those documents in the testimony. And the court had the benefit of knowing that much of what was pled in the amendment had been disabused by the testimony of Mr. Lane. And so in light of the fact that you have this avalanche of evidence that he says he's not the owner, but he is, all the documents say he is, I mean, we even put into evidence that he says he's not the owner, but in a police report he was an owner, in an insurance claim he was an owner. On his tax returns, coincidentally, and he testifies, to be fair to him, he testifies, I really am not an expert on taxes. But the circuit court and this court knows from the record that he lists on his tax returns $2.25 million worth of inventory in the tax year where this equipment was bought. And he paid $23,000 worth of interest to People's National Bank on his notes in that tax year, and lo and behold, $23,000 is listed on his tax return. Now, if a person lists inventory in interest on his tax return, and he claims simultaneously, I don't really own that equipment and I'm a broker, well, then I think a circuit court might say when an amendment is coming, and the amendment really doesn't change the case at all, it's still, the bus still gets driven into the cul-de-sac controlled by the Credit Agreements Act. He can look at all that and say, I'm going to exercise my discretion. We're done talking about this particular issue. So, I mean, I understand the harshness that exists sometimes in the law, and this is one of them. But I've been involved in lots of cases where I felt sorry for the plaintiff, and they run up against the law. And this is one of those cases. Thank you, Mr. Smith. Thank you, Your Honor. I'll confide myself to strictly rebuttal. Mr. Stone was looking for the name of the case that he relied on, and it was Staunton v. McBride, and he quotes that on page 8 of his brief. And the quote demonstrates why the Credit Agreement Act does not apply in this case. Quote, the language bars all claims by debtor based on or related to an oral credit agreement. Therefore, all actions which depend on their existence upon an oral credit agreement are barred by the Act. There is no oral credit agreement that Lane is positing, none. So I ask again, where is the oral credit agreement? It seems to me that Mr. Stone and the bank start from the proposition that the Act has to apply. Remember, we're being herded into a corner where this Credit Agreement Act will gobble up every claim. But the Credit Agreement Act doesn't walk around civil law. It's only applied if you fall within its ambit. And what is its ambit? Its ambit is a debtor may not maintain an action on or in any way related to a credit agreement unless the credit agreement is in writing. The credit agreement he's going to enforce is writing an oral credit agreement is not going to do. What did Mr. Stone argue just now? We can't skirt the Credit Agreement Act because the agency agreement, if it's any related to the notes, it's barred by the Credit Agreement Act. In other words, he's saying anything related, any defense, any cause of action that's related to signed notes that comply with the Credit Agreement Act are barred by the credit. It is somehow barred by the Credit Agreement Act. It's not in the language of the statute. It's not in the language of the statute. He's right that there was a 2619 motion that was granted in relationship to Lane's case, but initially it was supported only by the two promissory notes and the bill of sale. Then there was a dump of depositions in relationships to his response to our, to Lane's 2619 motion against the bank. Hey, I'm an authorized representative and under UCC I can get a move forward. And all of this is Lane saying here he owns it and he's saying there he doesn't own it. Ignore the fact that after the bank allegedly sold it to Lane, the bank sold $800,000 of that equipment without Lane's knowledge and kept all that money, absent the fact that every penny from insurance, every penny from the sale of any equipment went right to the bank. But legally, and we cite this in our reply brief, Reynolds v. Jimmy Johns, a Fourth District case, 2619A does not authorize the defendant to submit affidavits or evidentiary matter for purpose of contesting the plaintiff's factual allegations and presenting its version of facts. That's exactly what they're doing. That's exactly what they're doing. But that didn't matter to the trial court. If you read the findings of the trial court, he doesn't refuse to amend the complaint because he finds that there was no agency agreement. He doesn't. He says that because the credit agreement act bars the recruitment action and bars the DJ action, it's going to bar a fraud action or breach of fiduciary duty action. We aren't trying to skirt anything. The credit agreement has to be applicable in the first place. It doesn't live in a corner that if you walk by, it grabs you. There has to be an oral credit agreement. Where is it? Thank you, Mr. Johnson. Okay, this matter will be taken under advisement and a disposition will be issued before us. Thank you, gentlemen.